IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

Civil Case No. _____

| | | |
|---|---|---|
| **KALI DARARGEH, JEFFREY FERNANDE, AUGUST PITT AND DARREN ANDERSON,** | * | |
| **On Behalf of the UNITED STATES OF AMERICA,** c/o | * | |
| **110 East Lexington Street Suite 100** **Baltimore, MD 21202** | * | |
| | * | **FILED UNDER SEAL** |
| **Plaintiffs/Relators** | * | **JURY TRIAL DEMAND** |
| vs. | * | |
| **ARCH SYSTEMS, LLC,** **VINI EHSAN, President/CEO of** | * | |
| **ARCH SYSTEMS, LLC, and TARIQ EHSAN, VP** **of ARCH SYSTEMS, LLC** | * | |
| **1800 Washington Blvd** **Baltimore, MD 21230** | * | |
| | * | |
| **Defendants** | | |

## QUI TAM COMPLAINT

**NOW COME** RELATORS/PLAINTIFFS KALI DARARGEH, JEFFREY FERNANDE, AUGUST PITT AND DARREN ANDERSON (collectively "Relators" and/or "Plaintiffs"), and respectfully file this qui tam action in the name of the United States of America ("United States"), by and through attorneys David M. Silbiger, Esquire, and Mark R. Millstein, Esquire, and allege as follows:

1. That this is an action by qui tam Relators, on behalf of the United States against Defendants Arch Systems, LLC, Vini Ehsan, President and CEO of Arch Systems, LLC, and Tariq Ehsan, Corporate Officer and/or VP of Arch Systems, LLC, (collectively "Arch") to

1

recover penalties and damages arising from false statements and fraud Arch made against the United States.

2. That Arch is a limited liability company organized under the laws of the State of Maryland, that provides information technology services. Arch has benefited from having been awarded multiple multi-million dollar contracts to perform information technology ("IT") projects for the United States. Amongst the many contracts Arch has received, it has worked projects for the Center for Medicare & Medicaid Services ("CMS"), where it was assigned multiple IT contracts such as the Electronic Clinical Quality Measures project, Innovation Enterprise Architecture Support ("IEAS") project, Physician Quality Reporting System ("PQRS") project, Medicare Learning Network project, amongst many other contracts ("federal contracts") Arch received to perform work for the United States. That Relators are Maryland residents who have worked for Arch over a period of several years and served in capacities to include, high level project management and administrative management of the said federal contracts.

## Center for Medicare & Medicaid Services (CMS)

3. That the said CMS, is part of the Department of Health and Human Services. The Physician Quality Reporting System ("PQRS") is a quality reporting program that allows individual eligible professionals ("EPs") and group practices to report information on quality of patient care. PQRS gives participating EPs and group practices the opportunity to assess the quality of care they provide to their patients, helping to ensure that patients get the right care at the right time.

4. CMS contracted with Defendant Arch to perform measure-specific validation for the PQRS. The measure validation process is called Primary Source Verification ("PSV") and

2

was developed under CMS' guidance as part of the agency's efforts to improve data quality for the PQRS. In order to complete the PSV process, data must be collected through an electronic survey program known as CMTS.

5. The PSV process was to provide CMS with information on the overall rate of reporting error for PQRS, and identify measures or measure types for which reporting errors are most prevalent and the most common sources of those errors.

6. During the PSV process (not to exceed 45 days for an EP), nurse reviewers from Arch were to work with EPs and/or their designated representatives, to verify medical chart data. PSV results were to be categorized into three levels of compliance—High, Medium, or Low— and were to be explained in detail to the EPs. All results, analysis of data, and recommendations were then to be reported to CMS, along with recommendations on how to improve the accuracy of PQRS data and the quality of PQRS reporting.

7. The PSV process was to be conducted yearly and was to generate data to be useful in improving measures, identifying the causes of errors, and verifying accuracy. PQRS was a cost-plus project that Arch system had over a period of 5 years that was scheduled to end on September 8, 2017. A cost-plus contract, also termed a cost reimbursement contract, is a contract where a contractor is paid for all of its allowed expenses plus additional payment to allow for increased fringe, overhead, general and administration expenses.

8. In addition to receipt of direct employee and contractor hourly/monthly rates or salary, Arch would receive additional fringe (approximately between 20% and 30% of direct labor), overhead (approximately between 10% and 17% of direct labor) and general and administration ("G & A") (approximately between 20% and 30% of direct labor) expenses from CMS.

3

9. Arch was to receive monthly reimbursement for all of its costs, plus fringe, overhead and G & A associated with fulfilling its obligations under the PQRS contract up to the budget approved by CMS. The entire contract with CMS for PQRS was capped over the 5-year term.

10. Arch would earn maximum fringe, overhead and G & A if its costs incurred on the PQRS contract were at or near the contract cap, as its fringe, overhead and G & A, were directly related to its labor billing. Therefore, if Arch were able to complete the contract incurring less costs than estimated, it would result in less funds received for fringe, overhead and G & A.

11. Relators have no information as to the costs incurred by Arch under the PQRS contract during the first 4 years thereof, as none had access to financial data during that time. The final PQRS year ended on September 8, 2017. During its final year of performance, on or about November, 2016, CMS specifically instructed Arch not to perform the PSV process, eliminating most of the work to be performed under the contract by Arch.

12. Contrary to the instruction by CMS not to perform PSV and its related processes, Arch elected to update the CMTS application and bill the costs to do so to CMS under the PQRS contract, with corresponding fringe, overhead and G & A also billed. Arch also added Hypothesis Analysis to the scope of work under the PQRS contract and billed the costs to do so to CMS under the PQRS contract, with corresponding fringe, overhead and G & A also billed.

13. Vini Ehsan, president and owner of Arch, stated to Khalid Darargeh when questioned as to why the CMTS work under the PQRS contract was continuing in light of the instruction by CMS, responded that "Tim the GTL is too busy now and he is our friend we

should not worry about it." She made clear that billing would continue under the PQRS contract as in the past up to the 2.4 Million Dollar contract ceiling.

14. At the beginning of the final year of the PQRS contract, the Arch team working on the contract consisted of Abdul Nisar billing 50% of his time, Mobeena Mohamed billing 50% of her time, Shawn Xing billing 100 percent of his time, Avinash Ayyangari billing 100% of his time, Gernhun Redda billing 100% of his time, Damatora Battula billing 50% of his time, Dr. William Rollow billing part time hours to the project, and a team of nurses and Virna Elly billed 100% of their time.

15. Having received instruction from CMS not to perform PSV in November 2016, there was no work to be performed by the nurses under the PQRS contract and by March, 2017, all of the nurses had resigned from Arch despite their continuing to be paid to do no work.

16. The nurses were asked by Arch to remain on Arch payroll and bill to PQRS, but as there was no work for them to perform, they refused to stay, stating that to do so would be dishonest.

17. The resignation of each of the nurses resulted in a billing void for Arch under the PQRS contract. Unless Arch could bill additional costs, it could not bill for fringe, overhead and G & A.

18. Arch then hired people, had them perform tasks not related to the PQRS contract and nevertheless billed these new employees' time to the PQRS contract. For example, in December 2016, Farhad Saleem was hired to conduct Quality Assurance and Quality Control ("QA/QC") activities as part of CMTS, even though CMS had already informed Arch to cease that activity.

5

19. It was subsequently learned that Mr. Saleem is a close friend of Tariq Ehsan, husband of Vini Ehsan. Shawn Xing and Mobeena Mohammed were instructed by Vini Ehsan to update the Arch website and bill their time to PQRS, which they did.

20. Gernhun Redda, a developer skilled in the Java programing language was hired by Arch to work exclusively on the Integrated Project Management System ("IPMS") and even though this work had absolutely nothing to do with the PQRS contract, Mr. Reda was instructed to bill his time to the PQRS contract, which he did, not knowing that his work was not related to the PQRS contract.

21. Lekan Reju, also a Java developer, was hired as a sub-contractor and worked exclusively on the IPMS development project with Mr. Redda, and like Mr. Redda was instructed to bill his time entire time to PQRS, which he did.

22. To further make up for the reduced billing as the result of the departure of the nurses, Arch hired IT resources to work on several internal projects, such as the Arch website, IPMS, the reusable framework (RF), and another tool with the acronym ADDA, all unrelated to the PQRS contract and bill their time to the PQRS contract.

23. Arch became aware of a CMS request for proposal concerning a 60 to 110 million-dollar project known as IDOS, for which Arch intended to make a bid. The IPMS, RF, and ADDA work referenced above was initiated solely in contemplation of the IDOS bid and was billed to PQRS, even though it had nothing whatsoever to do with the PQRS contract.

24. In August, 2017, the number of resources billing to PQRS exceeded 30; however, only a handful of those 30 were actually performing work relevant to the PQRS contract, with only closeout and some documentation necessary at that time.

25. On November 14, 2016, Claimant Khalid Darargeh was hired by Arch as eCQM Manager, and IT resources Manager, with responsibilities to include oversight of the PQRS team members.

26. In August 2017, Claimant Khalid Darargeh was asked to assist Virna Elly as the Project Manager for PQRS. Virna Elly transitioned to IEAS in August 2017, another Arch contract for CMS, although she continued to bill on PQRS.

27. Claimant Khalid Darargeh was asked to approve timesheets for the IT staff billing to PQRS. Upon claimant Khalid Darargeh's review of the timesheets and the resources' artifacts (the resulting work), Mr. Darargeh refused to sign the timesheets stating that the work performed by the staff was not related to the PQRS contract.

28. Promptly after Mr. Darargeh's refusal to approving the above mentioned PQRS timesheets, he was laid off. As a result Arch's fraudulent billing under the PQRS contract, it is believed that CMS was defrauded in an amount greater than One Million Five Hundred Thousand Dollars ($1,500,000.00).

### Innovation Enterprise Architecture Support

29. In addition to the PQRS contract, Arch had additional contracts with CMS, including a contract known as Innovative Enterprise Architecture Support ("IEAS").

30. Under the IEAS contract, Arch was required to perform work for CMS.

31. The IEAS contract was to expire in August, 2017 and a 6-month extension was possible. Arch prepared a proposal to CMS for 4 people to continue on the IEAS contract requesting approximately $580,000.00 for the said extension. Vini Ehsan directed that an updated or modified proposal be sent to CMS for the IEAS 6 month contract extension in the amount of $880,000.00, indicating that 8 people would work to conclude the IEAS contract.

32. The second proposal was submitted to CMS as directed by Vini Ehsan. CMS then approved the contract extension to Arch in the amount of $880,000.00.

33. That even though Arch promised CMS that eight people, including full time enterprise architects, statisticians, and support personnel would work on the IEAS job for six months, resources were not hired to work on the contract extension as promised.

34. In fact, only 4 people continued on the IEAS job, namely – a project manager, 2 enterprise architects, and a technical writer/business analyst. No additional resources were ever hired to perform work.

35. Arch assigned only 4 people to complete the job and received $880,000.00, when Arch was prepared to bid $580,000.00 for the same work by the same number of people.

36. As a result of Arch's fraudulent acts and unethical business practices with respect to the IEAS contract, it is believed that CMS was defrauded in an amount approximately Three Hundred Thousand Dollars ($300,000.00).

## COUNT I: Violations of the False Claims Act
### (against all Defendants)

37. Each of the foregoing allegations is re-alleged and incorporated hereby.

38. As described in this Qui Tam Complaint, Defendant Arch, by and through its officers, agents, and employees: (i) knowingly presented, or caused to be presented, to the United States of America, false or fraudulent claims for payment or approval; and (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States of America.

39. Defendants Vini Ehsan and Tariq Ehsan authorized and ratified all of the violations of the False Claims Act committed by Arch's various officers, agents, and employees.

40. The United States of America and the citizens of the United States of America have been damaged as a result of Defendant Arch, Defendant Vini Ehsan and Defendant Tariq Ehsan's violations of the False Claims Act.

41. Relators request a jury trial on all issues so triable.

**WHEREFORE**, on behalf of each of the Relators and the United States of America, it is prayed:

(i) that this Honorable Court enter a judgment against Defendants Arch, Vini Ehsan and Tariq Ehsan, jointly and severally, in an amount equal to three times the amount of damages the United States of America has sustained as a result of Defendants' violations of the False Claims Act;

(ii) that this Honorable Court enter a judgment against Defendants for a civil penalty of $10,000 for each of Defendants' violations;

(iii) that Relators recover all costs of this action, with interest, including the cost to the United States of America for its expenses related to this action;

(iv) that Relators be awarded all reasonable attorneys' fees in bringing this action;

(v) that in the event the United States of America proceeds with this action, Relators be awarded an amount for bringing this action of at least 15%, but not more than 25%, of the proceeds of the action;

(vi) that in the event the United States Government does not proceed with this action, Relators be awarded an amount for bringing this action of at least 25%, but not more than 30%, of the proceeds of the action;

(vii) that Relators be awarded prejudgment interest;

(viii) that a trial by jury be held on all issues so triable; and

(ix) that Relators and the United States of America receive all relief to which any and all may be entitled at law or in equity.

Respectfully submitted,

David M. Silbiger, Esquire
Courtside Professional Building
110 East Lexington Street, Suite 100
Baltimore, Maryland 21202
Tel: (410) 685-1616

Mark R. Millstein, Esquire
Courtside Professional Building
110 East Lexington Street, Suite 300
Baltimore, Maryland 21202
Tel: (410) 752-5920

*Attorneys for Relators/Plaintiffs*
*Kali Darargeh, Jeffrey Fernande*
*August Pitt and Darren Anderson*